UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

GLADYS B.,[1]

                               Plaintiff                     DECISION AND ORDER

-vs-

                                                 19-CV-1166 CJS

COMMISSIONER OF SOCIAL
SECURITY,

                             Defendant.

_____

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant") which

denied the application of Plaintiff for Social Security Disability Insurance ("SSDI") benefits.

Now before the Court is Plaintiff's motion (ECF No. 9) for judgment on the pleadings and

Defendant's cross-motion (ECF No. 13) for the same relief.   For the reasons discussed below,

Plaintiff's application is granted, Defendant's application is denied, and this matter is remanded

for further administrative proceedings.

STANDARDS OF LAW

The Commissioner decides applications for SSDI benefits using a five-step sequential

evaluation:

> A five-step sequential analysis is used to evaluate disability claims. *See* 20
> C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether the
> claimant is currently engaged in substantial gainful activity. If he is not, the

---

[1] The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective
immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the
United States District Court for the Western District of New York, any non-government party will be identified and
referenced solely by first name and last initial."

Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].   Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.[2] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.   The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted)

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported

---

[2] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

2

by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773.   Substantial evidence is defined as "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).

## FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action.   The Court will refer to the record only as necessary to address the errors alleged by Plaintiff.

Plaintiff was born in 1980 and completed high school and some college. Tr. 441, 749. Plaintiff previously worked as a hairdresser in a salon. Tr. 735, 762.   At all relevant times, Plaintiff was a mother of two young children (one who was school age and the other who was still at home) and resided with her male partner.

On February 3, 2015, Plaintiff applied for SSDI benefits, alleging that she became disabled on January 11, 2013, Tr. 700, due to "arthritis," "shoulder problems on right side," "right knee problems," "carpal tunnel [in] both hands," and "ruptured disc in back and neck."[3] Tr. 748.   Plaintiff has also been treated for rheumatoid arthritis, fibromyalgia and headaches. Plaintiff also contends that she has become depressed in response to her medical problems.

---

[3] It is unclear why Plaintiff alleged that she had ruptured discs, since diagnostic testing does not reveal that she has them.

At all relevant times Plaintiff's primary care physician was Latecia Vazquez Velazquez, M.D. ("Vazquez"), though she also sought treatment for her various ailments with a number of specialists.   Plaintiff has, for example, sought treatment for pain in her right shoulder, right knee, and back.   Diagnostic testing of the right shoulder showed defects, secondary to dislocation of the shoulder, that were later corrected with surgery. Tr. 1028.   Plaintiff, though, still had some post-surgery complaints of shoulder pain and reduced range of movement. Tr. 1050, 1052.     Plaintiff also had arthroscopic surgery on her right knee, after a 2015 MRI scan of the right knee showed mild joint effusion and degenerative changes of the medial meniscus. Tr. 904, 909.   X-rays, MRI scans and CT scans of Plaintiff's spine and wrists were generally unremarkable.[4]  Tr. 863-864, 903-904, 909, 927, 963-964, 1028-1029, 1038-1040, 1047.

On October 17, 2014, Vazquez referred Plaintiff to rheumatologist Yerania Rodriguez, M.D. ("Rodriguez") regarding complaints of joint pain and stiffness. Tr. 972.   Plaintiff subsequently treated with Rodriguez through May 2016. Tr. 979, 984, 989, 1069, 1078-1079, 1081-1082.   During that period, Rodriguez diagnosed Plaintiff with rheumatoid arthritis and fibromyalgia.   On February 18, 2016, Plaintiff reported that her prescribed medications were not helping, and that she had severe joint pain, limited mobility, prolonged stiffness in the morning and severe limitation of her activities of daily living. Tr. 1079-1080.   However, on May 13, 2016, Plaintiff reported improvement with her new medication, Orencia, though Vazquez noted that Plaintiff was still suffering from myalgias and depression. Tr. 1081-1082.

On September 26, 2016, just three months prior to her last-insured date,[5]  Plaintiff

---

[4] The shoulder was surgically repaired with orthopedic hardware, and one of the orthopedic screws later became loose, irritating the muscle and necessitating revision surgery.
[5] December 31, 2016

began treating with a new rheumatologist, Salvador Vila Perez, M.D. ("Vila"). [6]  Tr. 1112.

Plaintiff's next visit with Vila was on January 16, 2017, after the last-insured date. Tr. 1113.

Vila subsequently saw Plaintiff again on May 25, 2017, Tr. 1114, and September 13, 2017, Tr.

1115-1120.   Vila noted that Plaintiff's diagnoses were rheumatoid arthritis and fibromyalgia,

and that Plaintiff had shown a "good response" after being prescribed Orencia. Tr. 1115.   Vila

noted that the results of his musculoskeletal examination were essentially normal, except for

spasms in the trapezius and paraspinal muscles, diffuse muscle tenderness and tenderness at

all 18 fibromyalgia trigger points. Tr. 1117.   Vila reported that the results of his neurological

examination were normal. Tr. 1117.   Vila stated that Plaintiff's rheumatoid arthritis had

"responded well to the Orencia," but that she still reported "severe pain due to the

[fibromyalgia]." Tr. 1118.   Vila noted, however, that "patient exercises," and that she "walk[ed]

for exercise four times per week." Tr. 1116.   Vila stated that his treatment plan was to

continue Plaintiff on Orencia, as well as Cymbalta, gabapentin and Flexeril, and to add

nabumetone. Tr. 1118.   Following his last treatment note, dated September 13, 2017, Vila

wrote a note stating:

> To Whom it May Concern:   Mrs. Gladys Burgos Lozada has a diagnosis of
> rheumatoid arthritis and fibromyalgia.   Although the rheumatoid arthritis is well
> controlled with Orencia, the fibromyalgia is not controlled.   She has severe pain
> due to the fibromyalgia and severe disability.   Medicinal cannabis is
> recommended to be tried due to her severe symptoms.

---

[6] Dr. Vila Perez is identified in the medical record primarily if not exclusively as "Dr. Vila," pursuant to "the convention in Spanish-speaking cultures to shorten surnames composed of the father's and mother's surnames to the first of the two surnames." *Hernandez v. United States*, 939 F.3d 191, 202 (2d Cir. 2019).   However, the ALJ's decision is somewhat confusing on this point, since it refers to Vila both as Dr. Vila, Tr. 26-27, and as Dr. Perez, Tr. 27-28.   The record is also confusing because the subject medical statement from Vila is contained in Exhibit 20F, which, according to the administrative transcript's table of contents, is records from a different doctor.

Tr. 1120.   Evidently, the purpose of the note was to allow Plaintiff to obtain medical marijuana.

Despite Vila's references to Plaintiff's severe pain from fibromyalgia, on July 6, 2017, Plaintiff reported that she was still exercising and could walk for one hour at a time. Tr. 1061, 1062.

On January 17, 2018, Plaintiff was seen by a new rheumatologist, Patricia Jordan-Gonzalez, M.D. ("Jordan-Gonzalez"), who performed a physical exam and made findings essentially identical to those found by Dr. Vila a year earlier. Tr. 1179.   That is, the results were essentially normal, with no joint tenderness and no swollen or painful joints, but with spasm in the trapezius muscles and "tenderness" at all fibromyalgia trigger points. Tr. 1179. Jordan-Gonzalez reported that Plaintiff complained of "widespread generalized pain," though she did not quantify that pain. Tr. 1177, 1180.   Plaintiff reportedly stated that she was not presently exercising, and Jordan-Gonzalez indicated that Plaintiff should "start routine exercise." Tr. 1180.

There were two administrative hearings in this matter, with the first being held on January 26, 2018 (Tr. 438-469), and the second ,supplemental, hearing being held on July 27, 2018. (Tr. 429-437).   Following the first hearing, the ALJ gave Plaintiff's attorney additional time to submit medical evidence.   Additionally, the ALJ developed the record by seeking a further medical opinion, by submitting written interrogatories to a medical doctor, Jose Rolon Rivera, M.D. ("Rolon"), who was provided Plaintiff's medical records.   Rolon's opinion will be discussed further below.   Both hearings were held in Puerto Rico, where Plaintiff resided at that time.

At the hearing, Plaintiff essentially testified that she is in constant pain from her fibromyalgia, of a severity of eight or nine on a scale of one-to-ten, and that her boyfriend essentially does everything around the house, including all chores, caring for the children, and even helping her get dressed because she cannot lift her right arm. Plaintiff stated that she can stand or walk for only five minutes, and that she can only lift three pounds. Tr. 443, 457-458. Although, as noted earlier, Plaintiff had told Dr. Vila that she was exercising regularly and could walk for one hour at a time. Tr. 1061-1062, 1179.

On September 5, 2018, the ALJ issued a written decision concluding that Plaintiff was not disabled at any time between the alleged disability onset date, January 11, 2013, and her last-insured date, December 31, 2016. Tr. 30.   Applying the five-step sequential evaluation discussed earlier, the ALJ found, at step two, that Plaintiff had severe impairments consisting of right shoulder degeneration, carpal tunnel syndrome, degenerative disc disease, rheumatoid arthritis and fibromyalgia. Tr. 20.

The ALJ found that Plaintiff also had a non-severe impairment of affective disorder. Tr. 21. In a discussion at this step, the ALJ reviewed the evidence concerning Plaintiff's mental impairment and concluded that Plaintiff had mild limitations in understanding, remembering or applying information, concentrating, persisting, maintaining pace, and adapting or managing oneself. Tr. 21-23.   The ALJ indicated, however, that this discussion pertained only to the severity of Plaintiff's mental impairment, and was not a residual functional capacity ("RFC") assessment, which required a more detailed analysis. Tr. 23.

At step three of the sequential evaluation, the ALJ found that none of Plaintiff's impairments met or medically equaled a listed impairment.   Prior to reaching step four, the

ALJ made an RFC finding that Plaintiff could perform less than a full range of sedentary work. The RFC finding generally mirrored the ALJ's statement concerning the medical evidence as follows:

> The medical evidence . . . shows that the claimant suffered from various physical impairments which could reasonably be expected to interfere with her abilities to do more than relatively minor lifting and carrying or to engage in prolonged standing or walking.   Her impairments also limited her to a reduced degree of postural and manipulative activities, and required she avoid certain environmental conditions that might prove dangerous or exacerbate her symptoms.

Tr. 24.   The RFC finding did not include any non-exertional limitations related to a mental impairment.

In explaining the RFC finding, the ALJ reviewed the medical evidence and opinion evidence. Tr. 24-28.   Regarding Plaintiff's physical impairments, the ALJ gave great weight to the opinion of Dr. Rolon who, as discussed earlier, had submitted answers to written interrogatories to the ALJ based on his review of Plaintiff's medical records. Tr. 1185-1194.[7] Rolon indicated that Plaintiff's impairments ("connective tissue inflammatory arthritis" right knee and right shoulder problems) did not meet a listing. Tr. 1186.   Rolon further stated that during an 8-hour workday, Plaintiff could sit for six hours and stand or walk for four hours, that she could lift and carry up to 10 pounds frequently and 20 pounds occasionally, that she could reach overhead only occasionally, but that she could otherwise use her hands and arms frequently. Tr. 1190.

---

[7] The ALJ posed the interrogatories to Rolon at the request of Plaintiff's attorney, who indicated at the initial hearing that additional medical opinion would be helpful since he believed that Plaintiff's physical ailments met a listing. Tr.430, 448.

The ALJ gave "some weight" to the opinion of Carlos Pantojas, M.D. ("Pantojas") who, on April 13, 2015, had performed a rheumatological examination of Plaintiff at the Commissioner's request.   Plaintiff reportedly told Pantojas that she had had body and joint pain for eight years that was worsening; that she had "constant pain" that was worse in the mornings; that she had swelling of the hands and feet and stiffness in the mornings; that her medications did not help with her pain; and that "long walking and daily household work worsen[ed her] pain." Tr. 919.   Plaintiff, though, denied having headaches or pain in her muscles, neck or back. Tr. 920.   Upon examination, Pantojas noted tenderness in the trapezius, back, elbows and hips, painful range of motion in the wrists, paravertebral tenderness and decreased range of motion in the shoulders, but otherwise normal range of motion and normal neurologic signs except for decreased strength (4/5) in the hands and right leg. Tr. 921.   Pantojas' diagnosis was rheumatoid arthritis, suspected fibromyalgia, carpal tunnel syndrome in both hands and paravertebral myositis.   Pantojas concluded that Plaintiff could have difficulty with long-sustained sitting, standing or walking, problems lifting and carrying objects of moderate or heavy weight and difficulty handling objects repetitively. Tr. 921.

Lastly the ALJ discussed an opinion from treating rheumatologist Dr. Vila, whom the ALJ referred to as "Dr. Perez."   That opinion was the "to whom it may concern" note, discussed earlier, in which Vila briefly described Plaintiff's condition, stated that she was disabled, and indicated that she should try medical marijuana.   The ALJ assigned "little weight" to the opinion, finding that it was "vague, lacking a function-by-function assessment, and conclusory, relating to the issue of disability reserved to the Commissioner." Tr. 27.   The

ALJ further stated: "Further, to the extent it can be interpreted to suggest the claimant was incapable of performing any manner of work activity, even of a sedentary nature, it is simply not supported by an objective record showing no more than moderate findings." Tr. 28.

This ALJ's RFC discussion did not include any mention of Plaintiff's mental health treatment or any opinion evidence concerning a mental impairment.   Rather, the discussion of such evidence was at step two of the sequential evaluation where, as already discussed, the ALJ found that Plaintiff had at most mild limitations in various work-related mental functions. In that discussion at step two, the ALJ indicated that she gave great weight to the opinion of Dr. Ana Gonzalez ("Gonzalez"), who testified at the initial administrative hearing after reviewing all of the medical evidence and observing Plaintiff testify at the hearing, Tr. 460-461. Dr. Gonzalez, however, did not really offer any opinion, other than that Plaintiff's mental impairment did not meet a listing. Tr. 461.   The ALJ also stated, at step two, that she gave significant weight to the opinion of a state-agency examiner, Barbara Hernandez, Psy.D. ("Hernandez"), who opined that Plaintiff had only mild limitations in activities of daily living and maintaining social functioning and no limitation in maintaining concentration, persistence or pace, that her symptoms were minimal and secondary to her physical problems, and that her affective disorder was not severe. Tr. 21-22, 492.

At step four of the sequential evaluation, the ALJ found that Plaintiff could not perform her past relevant work as a hairdresser.   However, at step five, the ALJ found, based on testimony from a vocational expert ("VE"), that Plaintiff could perform other work available in significant numbers, and that she was therefore not disabled.   Plaintiff sought review from the Appeals Council, but it declined to review the ALJ's decision.

11

In this action, Plaintiff asserts primarily that the ALJ erred in her handling of medical opinion evidence from Dr. Vila,[8] referring to the same "to whom it may concern" note in which Vila had stated that Plaintiff should be permitted to obtain medical marijuana. (*See*. Tr. 1120, note by Vila).   As a second argument, Plaintiff maintains that the ALJ erred by failing to consider her mild mental impairments at steps four and five of the sequential evaluation.   The Court will discuss each argument in greater detail below.

Defendant disputes Plaintiff's arguments and maintains that the ALJ's decision is free of reversible legal error and supported by substantial evidence. Alternatively, Defendant contends that even if the ALJ erred by failing to consider Plaintiff's mental impairments at steps four and five of the sequential evaluation, the error was harmless.

The Court has carefully reviewed and considered the parties' submissions.

DISCUSSION

The ALJ's Handling of Dr. Vila's Opinion

Plaintiff alleges that the ALJ committed three errors regarding medical opinion evidence from Dr. Vila:

Here, there are three problems with the ALJ's treatment of Dr. [Vila's] opinion. First, the ALJ did not give good reasons for rejecting [Vila's] opinion by engaging in a consideration of the relevant statutory factors. The ALJ's discussion of [Vila's] opinion is perfunctory and merely states, without citation to any evidence, that [Vila's] opinion was "not supported by an objective record showing more than moderate findings." T. 28. Initially, the ALJ's conclusory reasoning did not constitute a "good reason" to wholesale reject [Vila's] opinion.   Moreover, the ALJ did not consider that [Vila] was a rheumatologist with a specialty that none of the other doctors issuing opinions in this case had; he did not consider the extent to which the opinion was actually supported by the evidence other than in this

_____

[8] Plaintiff's actual argument is that the ALJ did not properly evaluate medical evidence from "Dr. Perez," referring, again, to Dr. Vila, whom the ALJ to as "Dr. Perez" when evaluating the subject statement. Tr. 27.

conclusory manner; he did not properly consider the opinion's consistency with the record; and he did not consider that fibromyalgia is an impairment that courts have recognized often lacks objective findings to support it.   The ALJ's failure to consider the factors was a procedural error requiring a searching review to determine whether the ALJ complied with the substance of the treating physician rule, which he did not.

***

The second problem with the ALJ's evaluation of [Vila's] opinion is that the ALJ did not make any attempt to clarify the opinion with [Vila], where the ALJ himself conceded that the opinion "is vague, lacking a function-by-function assessment, and conclusory, relating to the issue of disability reserved to the Commissioner." T. 27. The ALJ had a duty to recontact [Vila], especially where [Vila] was Plaintiff's regular treating rheumatologist and the opinion involved rheumatoid arthritis and fibromyalgia, to clarify the extent of Plaintiff's functional limitations that resulted in [Vila's] categorical opinion that she was disabled.   Plaintiff notes that although [Vila] opined that Plaintiff had "severe disability," an opinion that is reserved to the Commissioner, his opinion also stated that Plaintiff's fibromyalgia resulted in "severe pain," an opinion that is vague, but certainly relevant to the functional ability to stay on task and the various functional requirements of any sedentary job. The ALJ had a duty to clarify the extent of Plaintiff's limitations resulting from this pain.

The third problem with the ALJ's treatment of [Vila's] opinion is that the ALJ clearly attempted to interpret the raw medical data instead of crediting [Vila's] assessment. The ALJ's sole substantive reason for rejecting the opinion was that "to the extent it can be interpreted to suggest [Plaintiff] was incapable of performing any manner of work activity, even of a sedentary nature, it is simply not supported by an objective record showing more than moderate findings." T. 27-28. The ALJ did not cite any evidence for this proposition and he is not equipped to interpret the, as he termed it, "moderate findings."   Moreover, in making this broad, unsupported finding instead of clarifying the opinion to determine [Vila's] underlying reasoning and medical assessment of Plaintiff's functional limitations, the ALJ obviously substituted his judgment for [Vila's] expertise.   For all of these reasons, the ALJ's analysis of [Vila's] important specialist treating opinion was deficient and remand is required.

Pl.'s Mem. of Law at pp. 13-17 (case citations omitted).

The Court does not find Plaintiff's arguments concerning Vila's opinion to be persuasive. To begin with, Plaintiff's description of the subject note as an "important specialist treating opinion" is clearly overstated.   Rather, the purpose of brief note appears to have merely to allow Plaintiff to obtain medical marijuana.

Indeed, the Court questions whether the note is truly a "medical opinion," despite the ALJ's reference to it as such.   In this context, "[m]edical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1) (Westlaw 2021).   Courts have held that a doctor's statement that does not contain any assessment of the claimant's *functional abilities* is not properly a medical opinion within the meaning of § 404.1527(a)(1). *See, e.g., Moua v. Colvin*, 541 F. App'x 794, 797 (10th Cir. 2013) ("Overall, Dr. Bhakta's treatment notes do not offer any medical opinions concerning Ms. Moua's abilities or limitations. Rather, they document her complaints and chronicle the pain medications and treatment he prescribed for her. Thus, there was no pertinent medical opinion for the ALJ to weigh."); *see also, McNaughton v. Comm'r of Soc. Sec.*, No. 18-CV-1004L, 2020 WL 210080, at *7 (W.D.N.Y. Jan. 14, 2020) ("Here, the records cited by McNaughton are more accurately described as treatment notes than medical opinions. In each of the records, Waghmarae summarized McNaughton's reason for the appointment, her past medical/surgical history, provided an overview of symptoms and medications, described physical findings upon examination, and stated a treatment plan. *Significantly, though, Waghmarae does not provide a judgment or description of what McNaughton could do despite her impairments.* Therefore,

14

the records do not qualify as medical opinions, and the ALJ did not err in failing to discuss Waghmarae's notes cited by McNaughton.") (emphasis added); *Ramos v. Berryhill*, 395 F. Supp. 3d 329, 341 (S.D.N.Y. 2019) ("While these statements do discuss Ramos's symptoms and note limitations, *the letter does not discuss the extent of the functional limitations caused by Ramos's symptoms, nor does it discuss the implications for Ramos's ability to work*. As a result, the ALJ cannot be faulted for failing to give "controlling weight" to the statements contained in this letter since they do not speak to Ramos's ability to work.") (emphasis added); *Corbiere v. Comm'r of Soc. Sec.*, No. 816CV1152GTSWBC, 2018 WL 704396, at *2 (N.D.N.Y. Feb. 5, 2018) ("[O]bjective evidence does not constitute opinion evidence without a statement from a physician tying that objective evidence to specific functional limitations. To find otherwise would defy logic in that it would suggest that every piece of medical evidence in the record (including test results and treatment notes) constitutes a medical opinion subject to 20 C.F.R. § 404.1527 analysis."), *aff'd sub nom. Corbiere v. Berryhill*, 760 F. App'x 54 (2d Cir. 2019).   Here, the only opinion by Vila concerning Plaintiff's functional abilities was his bald assertion that she was disabled, which is an issue reserved for the Commissioner.

In any event, the Court further finds that the ALJ did not violate the treating physician rule[9] with regard to Vila.   Plaintiff's argument on this point involves the well-settled principle that,

[w]hen assigning less than "controlling weight" to a treating physician's opinion,

---

[9] Proper evaluation of a treating physician's opinion is a two-step process in which the ALJ must first decide whether to give controlling weight to the opinion and, if not, then must determine the amount of weight to give the opinion. *See, Estrella v. Berryhill*, 925 F.3d at 95 ("Social Security Administration regulations, as well as our precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion. First, the ALJ must decide whether the opinion is entitled to controlling weight. . . Second, if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it.").   The ALJ's decision at both steps must be supported by substantial evidence. *Id*. at 96.

> the ALJ must "explicitly consider" the four factors announced in *Burgess v. Astrue*, 537 F.3d 117 (2d Cir. 2008). *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019) (internal quotation marks omitted). Those factors are "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." Id. at 95–96 (citation omitted).   A reviewing court should remand for failure to consider explicitly the *Burgess* factors unless a searching review of the record shows that the ALJ has provided "good reasons" for its weight assessment. *Id*. at 96.

*Meyer v. Comm'r of Soc. Sec*., 794 F. App'x 23, 26 (2d Cir. 2019); *see also*, 20 CFR 404.1527(c) (listing the factors to be considered as to all medical opinion evidence, except where controlling weight is given to a treating physician's opinion).   Put differently, an ALJ's failure to explicitly consider the *Burgess* factors when assigning less-than-controlling weight to a treating physician's opinion is a "procedural error" that will require remand, unless the ALJ provides sufficiently good reasons for his weight assignment that the court can conclude the substance of the treating physician rule was respected. *See, Estrella v. Berryhill*, 925 F.3d at 96 ("An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error.   If the Commissioner has not otherwise provided 'good reasons' for its weight assignment, we are unable to conclude that the error was harmless and consequently remand for the ALJ to comprehensively set forth [his or her] reasons. If, however, a searching review of the record assures us that the substance of the treating physician rule was not traversed, we will affirm.") (citation and internal quotation marks omitted).

Here, the ALJ expressly stated that she considered the medical opinion evidence "in accordance with the requirements of 20 CFR § 404.1527." Tr. 24.   Further, the ALJ noted that Vila was a treating doctor and a rheumatologist, and that Plaintiff only began treating with Vila

in September 2016, three months before her last-insured date. Tr. 26. Indeed, Plaintiff only visited once Vila once prior to her last insured date, and as of the date that Vila wrote his note, she had only seen him on four occasions, Tr. 1115-1120, after which Plaintiff switched to a different rheumatologist, so there was no long-term treating relationship.   Moreover, the ALJ indicated that Vila's statement was "vague, lacking a function-by-function assessment, and conclusory, relating to the issue of disability reserved to the Commissioner," all of which is true.[10]  Finally, the ALJ stated that insofar as Vila's note could be "interpreted to suggest the claimant was incapable of performing any manner of work activity, even of a sedentary nature, it is simply not supported by an objective record showing no more than moderate findings,"[11] which is also correct, as there are no such findings.   Vila's statement that Plaintiff was completely disabled was based on a combination of his findings (positive trigger points, etc.) and Plaintiff's subjective complaints of pain.   However, the ALJ found that Plaintiff's subjective complaints were not entirely credible, and other doctors, including Dr. Rolon and Dr. Pantojas, did not indicate that Plaintiff had disabling limitations, despite her claims of extreme pain.   In sum, the Court finds that the ALJ gave sufficiently good reasons for the weight assigned to Vila's statement, and that the substance of the treating physician rule was followed.

Nor was the ALJ required to re-contact Vila simply because she found Vila's statement to be vague where, as here, the medical record was otherwise complete.   In other words, the mere vagueness of Vila's statement did not create a gap requiring further development of the record.[12] *See*, *Petrie v. Astrue*, 412 F. App'x 401, 406 (2d Cir. 2011) ("We have held that 'an

---

[10] Tr. 27.

[11] Tr. 27-28.

[12] It is of course well settled that an ALJ has a duty to develop the record in certain instances, and that the ALJ's

ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.' *Rosa*, 168 F.3d at 79 (citing *Schaal*, 134 F.3d at 505). '[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel.' *Id*. (internal quotation marks omitted). However, we have also recognized 'the flip-side of this same proposition': 'where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.' *Id*. at 79 n. 5."); *see also*, *Dorta v. Saul*, No. 19CV2215JGKRWL, 2020 WL 6269833, at *7 (S.D.N.Y. Oct. 26, 2020) ("The plaintiff argues that, if the ALJ found aspects of Dr. Fujiwaki's opinion 'vague,' the ALJ was required to seek more information. To the contrary, as the Magistrate Judge correctly noted, where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, an ALJ is under no obligation to seek additional information in advance of rejecting an application.") (citing *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999); internal quotation marks omitted.) (Koeltl, J.).

Lastly, the Court does not agree with Plaintiff that "the ALJ obviously substituted h[er] judgment for [Vila's] expertise," insofar as she stated that Vila's note was inconsistent with "moderate findings" in the record, since she was "not equipped to interpret" such findings.   Of

---

failure to do so may warrant a remand: "Where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel or by a paralegal. The ALJ's duty to develop the record reflects the essentially non-adversarial nature of a benefits proceeding. An ALJ's failure to develop the record warrants remand." *Guillen v. Berryhill*, 697 F. App'x 107, 108 (2d Cir. 2017) (citations and internal quotation marks omitted).   However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Guillen v. Berryhill*, 697 F. App'x 107 at 108.

course, an ALJ is not permitted to substitute her own judgment for competent medical opinion, based on her interpretation of raw medical data.   Here, though, there were no more than moderate objective findings in the record, and Vila's assertion of total disability due to pain from supposedly uncontrolled fibromyalgia was contrary to other medical opinions, including those from Pantojas and Rolon.

The ALJ's Treatment of Plaintiff's Mental Impairment

The Court agrees, however, with Plaintiff's argument that remand is required due to the ALJ's failure to properly explain how, if at all, Plaintiff's non-severe mental impairment was factored into the RFC finding.   On this point, Plaintiff states:

> At step two, the ALJ found that Plaintiff's mental impairments were nonsevere. Importantly, he gave significant weight to the state agency review consultant's opinion that Plaintiff had mild limitations in activities of daily living and maintaining social functioning.   By the time the ALJ reviewed the case, the regulations' domains had changed, see 20 C.F.R. § 404.1520a, and the ALJ found that Plaintiff had mild limitations in understanding, remembering, and applying information and concentrating, persisting, or maintaining pace.   It is entirely unclear, and the ALJ did not explain why, he found no limitations in interacting with others at the same time he gave significant weight to Dr. Hernandez's opinion that Plaintiff had mild limitations in maintaining social functioning.   Regardless, the ALJ did not go on to consider Plaintiff's mental limitations when determining Plaintiff's RFC or what jobs she could do at step five.   The ALJ erred in failing to consider Plaintiff's mental impairments throughout the balance of the sequential evaluation, particularly in a case where she had widespread pain as attested by Dr. [Vila].   The ALJ was required to consider all of Plaintiff's impairments, whether severe or nonsevere, throughout the balance of the sequential evaluation. The ALJ's failure to discuss mental limitations at steps four and five indicates that he did not do this.   Moreover, the ALJ's finding of mild limitations at step two makes the error more, not less, harmful. Even mild limitations must be considered at steps four and five of the sequential evaluation in order for the decision to be supported by substantial evidence.

Pl's. Mem of Law at pp. 17-19.

As mentioned earlier, at step two of the sequential evaluation, the ALJ discussed the medical evidence concerning mental health and found that Plaintiff's mental impairment was not severe. The ALJ indicated, though, that more detailed findings concerning this impairment would be made in connection with the RFC determination prior to step four, and that did not happen. There was no mention of Plaintiff's non-severe mental impairment during the RFC discussion, or during the discussions at steps four and five of the sequential evaluation, which was an error. *See, e.g., Thompson v. Astrue*, 416 F. App'x 96, 97 (2d Cir. 2011) ("Where, as here, the claimant has more than one impairment, the ALJ must account for the combined effect of all impairments on a claimant's ability to work, regardless of whether each impairment is severe.") (citing *Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir.1995)). More specifically, as relevant here, "[a] RFC determination must account for limitations imposed by both severe and nonsevere impairments." *Parker-Grose v. Astrue*, 462 F. App'x 16, 18 (2d Cir. 2012) (citing 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe [ ]' ... when we assess your [RFC]....")). An ALJ's failure to consider a non-severe impairment when making an RFC determination is legal error. *Parker-Grose v. Astrue*, 462 F. App'x at 18 ("In this case, after finding that Parker–Grose's mental impairment of depression does not cause more than minimal limitation in her ability to perform basic mental work activities and is therefore nonsevere, the ALJ determined Parker–Grose's RFC without accounting for any of the limitations arising from her mental impairment that were established by substantial

20

evidence in the record. Thus, the ALJ committed legal error.") (citations to record and internal quotation marks omitted).

The Commissioner maintains that even if the ALJ erred in this regard, the error was harmless, since the ALJ incorporated functional limitations relating to Plaintiff's mental impairment into a question posed to the VE, which the VE answered by indicating that Plaintiff could perform other work even with such limitations.   The Court would agree with the Commissioner, provided that it was clear that the hypothetical question had incorporated whatever functional limitations might result from the non-severe mental impairment. *See, e.g., Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) ("Appellant's argument that remand is necessary because the ALJ failed to address the fact that he uses a medically-required hand-held device fails as well. . . . The evidence presented by appellant was insufficient to support a finding that his cane was medically necessary.   . . .   Even if the ALJ erred regarding the cane, though, any error was harmless as he asked the vocational expert to take the cane into account and there were still jobs available that appellant could perform."); *see also, Sokolowski v. Comm'r of Soc. Sec.*, No. 5:13-CV-744 GLS, 2014 WL 2532485, at *4 (N.D.N.Y. June 5, 2014) ("Although the ALJ did not include this limitation in her ultimate RFC determination, at step five of the sequential analysis, the VE explicitly considered a restriction to occasional handling and fingering, and testified that there were existing jobs Sokolowski would still be able to perform.   Accordingly, the ALJ's failure to include such a limitation in her RFC analysis is, at most, harmless error.").

Here, however, the hypothetical question posed by the ALJ to the VE was poorly worded,[13] making it impossible for the Court to determine exactly what functional limitations the ALJ was asking the VE to consider. Tr. 435 (ALJ: "If we added to this hypothetical, performing simple, routine tasks, to follow instructions, use judgment and changes in the work setting.   That responds appropriately to coworkers and supervisors, and the public frequently. Could she do her past work?").[14]   Consequently, the Court cannot say that the ALJ's error was harmless, and remand is therefore necessary for the Commissioner to reconsider the RFC finding in light of all of Plaintiff's impairments.

CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No. 9) for judgment on the pleadings is granted, Defendant's cross-motion (ECF No. 13) for the same relief is denied, and this matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this Decision and Order.

So Ordered.

Dated: Rochester, New York
        March 25, 2021

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge

---

[13] Or, perhaps the question was poorly transcribed, as it seems that words may be missing from the transcription.
[14] This verbatim question was the only one posed by the ALJ to the VE that referred to limitations relating to mental impairments.